## PURTON et al. *v.* THE NEW ORLEANS AND CARROLLTON RAILROAD COMPANY.

Incorporated trading companies are not partnerships, according to the legal principles applicable to partnerships formed by the voluntary agreement of individuals. The association of the share-holders does not constitute a partnership according to the custom of merchants, nor within the principles of law established respecting joint traders. Corporations are to be treated with reference to the objects of their creation, and to the express powers with which the legislature may have invested them; and to that extent the general law of partnership is superseded by the charter.

Where the charter of an incorporated trading company declares that its capital shall consist of a certain sum, divided into shares of a certain amount, to be paid in at such times and in such proportions as may be required by the president and directors, but does not oblige the directors to call in the whole amount of the shares, though the share-holders will be liable to third persons for the full amount of their subscriptions, whether called in or not, yet the adoption of a resolution by the president and directors making the call, being an uncertain event, forms a condition which, as between the share-holders themselves, suspends the obligation to pay the balance of their subscription until a call is made as provided by the charter.

The charter of a banking company provided that its capital should be divided into shares of one hundred dollars each, of which five dollars should be paid at the time of subscribing for the shares, and the residue in such instalments, and at such times, as might be required by the directors. Fifty dollars on each share having been called in and paid, a resolution was subsequently adopted by the directors, providing "that any stockholder who shall pay in anticipation a part, or the full amount due on the stock held by him, shall be entitled to dividends thereon in proportion to the amount so paid in." *Held,* that the payment of the stock in full under the resolution of the board of directors cannot be considered as a loan to the company of the sum thus paid above the amount called in; that the contract between those who thus paid in full and the company, was a contract of partnership (C. C. 2772), the consideration stipulated being, a participation in the profits of the company, and not interest; that being entitled to receive the whole profits made upon the additional sum paid, they cannot be exempted from contributing to losses on that amount; that even an express stipulation to exempt them from such contribution, had it been made, would be void, both as to the partners and third persons (C. C. 2785); that the shares were necessarily unequal; and that the inequality exists for the purposes of liquidation as well as for the division of profits.

APPEAL from the Fifth District Court of New Orleans, *Buchanan,* J. The facts of this case are stated fully in the opinion *infrâ:*

*Denis* and *R. N.,* and *A. N. Ogden,* for the plaintiffs. There exist three classes of stockholders: 1st. Those who have paid $50 per share, in conformity with the call of the board of directors. 2d. Those who have paid $50, the regular call, and $50 to complete their share to $100, in virtue of a resolution of the board, authorising them to do so. Finally, this second class of stockholders is further divided into another composed of those who, having paid $100 per share, bought property of the institution and paid the price of said purchase with one half of their shares, reducing therefore the amount of their share to $50, and having received in property $50 on account of the same. Under this state of things, the present board of directors advertised a division of the assets realised, and proposed to give, to the first class of stockholders, those who have paid $50, $5 per share; to the second class, those who have paid $100, $15 per share; and to the third, those who having paid $100, have already received $50 in property, $10 per share.

That this distribution would be unjust and arbitrary, is manifest. If the stockholders had all paid the same sum, they should receive the same dividend. If they have paid, some $50, some $100 per share, they should receive in

PURTON
v.
NEW ORLEANS
AND CARROLL-
TON RAILROAD
COMPANY.

proportion to what they have paid; if those who have paid $50 receive a dividend of $5, those who have paid $100 should receive $10, and not $15. And why those who have paid $100, and who have already received $50 in property, are to receive $10, is unaccountable. If, in accordance with the judgment in the case of *Millaudon* v. *The New Orleans and Carrollton Railroad and Banking Company*, (a judgment which will never stand the test of another judicial investigation,) they are to be considered as creditors for the $50 paid beyond the regular payment of the $50 per share, having received that sum of $50 for which they were creditors or pretended to be so, they must at least return to the class of the stockholders who have paid but $50 per share, and receive a dividend similar to them. But no: they are allowed $10 a share, whilst $5 only are allowed to the others. On the part of the plaintiffs we say, that this class of stockholders who have received $50 per share, or 50 per cent of their capital, cannot receive any thing until the other stockholders, who have yet received nothing, have actually received 50 per cent of their capital, i. e. the stockholders of the first class $25, those of the second class $50.

How can they be creditors? The bank never borrowed money from them; they became stockholders for the whole sum, had all the advantages as such, and certainly they are in law and sound logic to bear the disadvantage of the situation which they made for themselves. Could the idea have been entertained by either the bank or themselves, that they should have the benefit and advantage of stockholders for full paid shares, and only the loss and disadvantage for half paid shares? The board never called but for $50 per share; but by a resolution they authorised those of the stockholders who should desire it, to make an additional payment of $50 per share, and so to complete by anticipation the full payment of their share, with this condition, that they should receive dividends on the full amount paid in. This measure was not taken for the interest of the company, but for the interest of certain large stockholders. It was passed at their solicitation; their object was to render their stock saleable in the European market, where no half stock can be disposed of; the stock was then at an advance. These stockholders had all the advantage of the resolution they solicited and voluntarily acquiesced in; nay, they had undue advantage by it; they paid this increase of their stock by loans from the bank; they were entitled to a loan of $40 per share, whilst the half paid stock were only entitled to $15. They not only received dividends, but it was sufficient that their extra payment should have been three months before the terms of declaring dividend, to entitle them to a full dividend; the earning of six month's interest they had for three months. If the company had been prosperous, they never would have pretended on a general settlement to be mere creditors of $50 per share; they would have required their proportion in the profits of the institution before claiming their capital; it would have been just and would have been awarded to them without opposition. But it is only because the affairs of the institution have not been prosperous, that these persons are trying to make themselves stockholders for $50 and creditors for $50. It is not an extraordinary thing in public associations to see stockholders interested in different proportions. In the State Bank there is half paid, three quarters paid, and full paid stock. None of these two last classes of stockholders have ever dreamt that they were creditors of the bank for the sums paid over by them; they all consider themselves as stockholders for the amount paid by them.

The petitioners therefore hope that this court will decide: That the assets of the bank for the present must be divided between the stockholders of the first and second class, in proportion to the sums paid by them, to wit: to the stockholders who have paid $50 per share, one-half of the dividends of the stockholders who have paid $100 per share; and that such of the stockholders as have received $50 per share in property, will not receive any dividend until all the other stockholders have received 50 per cent of their stock; and also that the stockholders who are indebted on their stock-loan will not actually receive the dividend, but be credited *pro tanto* on their said loan.

*Benjamin* and *Micou*, for the appellants. This suit revives the controversy settled by the Supreme Court in the case of *Millaudon* against the same company, reported in 3d Robinson's Reports. As that case adjudicated only the rights of *Millaudon*, and the directors were still undetermined whether to adopt its principles as the rule of future divisions, a suit was ordered and accordingly brought in the late Commercial Court, the object of which was, to bring into court all the shareholders, to require them to discuss *inter se* their respective

rights, and to provoke a decision binding upon them all. The directors representing all the stockholders, did not deem it their duty to decide as to their respective rights; and therefore, after the institution of this suit, and after citing all the shareholders, remained for sometime inactive. The two classes of shareholders, remained for some time inactive. The two classes of shareholders although thus confronted in court, took no step to settle their controversy, and the directors considered themselves eventually obliged to act.

The rule laid down in *Millaudon's* case was adopted, and a dividend was declared, giving out of the assets on hand to be distributed, $5 per share to the half paid stock, $15 per share to the full paid stock, and to a third class, now to be noticed, $10 per share. This class was composed of those who had originally paid $100 per share, but had purchased property from the company to the amount of $50. The property had been sold at auction, the price payable in the half paid stock, and in that portion of the full paid stock which had been regularly called in by the board. The remaining interest of these shares, consequently represented the voluntary payment only. Upon the declaration of this dividend, the plaintiffs (who are holders of the half paid stock) brought this suit, and obtained an injunction against its payment, and the question now to be decided, is whether the injunction shall be maintained.

The leading principle of the decision in *Millaudon's* case was the equality of the shares of stock: to wit, that although some had paid in full, and others only in part, yet that, for the purposes of liquidation, the stock must all be treated as shares of $100, as fixed by the charter. On the other hand, the opponents of that decision, direct their arguments to establish that the shares, instead of being equal, are to be treated as $50 and $100 shares, according to the payments, without any reference to the subscription. Hence the real and only question in the cause is, whether the shares, *for the purpose of liquidation*, are equal. If they are unequal, the plaintiffs entertain correct views as to the division of the capital and assets; if equal, they were greatly mistaken in their rights when they presented the petition now before the court. The charter of the company fixes the shares at $100 each, giving to each an equal vote. Each shareholder, by his subscription, bound himself to the full payment of his stock, subject to the call of the direction. The call for $50 a share, which was paid, left all the stockholders debtors to the amount of $50 per share. Thus far there was no inequalty. The permission, that any stockholder might anticipate the payment of the balance of his subscription, receiving dividends on the whole amount paid, gave to all the opportunity of satisfying the obligation assumed in subscribing. Some paid, thus extinguishing their obligation, while others remained debtors as before, for the balance due on their stock. This resolution and the payments under it, are alleged to have destroyed the equality contemplated by the charter. To produce such an effect, it must necessarily release the non-paying stockholders from a portion of the liability incurred by their subscription, for if the shares are still $100 each, the mere circumstance of one being paid in full, and the other half paid, would not render them unequal. The debt of the non-paying shareholders, stands as the equivalent of the capital of those who paid, and is liable to be called in at the will of the direction. Now it is apparent that the resolution of the board did not attempt to release any part of the obligation resulting from the original subscription. So far from it, that obligation is the very basis of the resolution itself, and, recognising the fact that all are bound to pay on demand, simply permits all to pay before demand. It is equally apparent that the power of the direction was not competent to release any part of the liability of the stockholders. Their liability was fixed by the charter, and the board had no power to disturb it. - But it is contended by the counsel for the plaintiffs, and the argument was urged by the counsel for the bank, in *Millaudon's* case, that the obligation to pay the stock in full, contracted by subscribing, was not absolute, but conditional. The debt is said to be dependent upon the call of the board; the call of the direction, and not the amount of the subscription, is assumed as the true measure of responsibility. This argument if true, for one purpose, should be true for all, or else some good reason should be adduced for a distinction. Yet the counsel concede that it is not true, as to creditors of the corporation; that even if the direction refused to call, the courts would either compel the board to make the call, and pay the debts, or else, give the creditors an immediate remedy against the shareholders. Now the obligation of the stockholders to creditors of the corporation is remote and not direct. It is not expressed in the charter, but arises from implication.

PURTON
*v.*
NEW ORLEANS
AND CARROLL-
TON RAILROAD
COMPANY.

On the other hand the obligation to pay the stock is direct and express towards the corporation, is created by the charter, and is directly assumed by the subscription. The argument thus gives to the implied and remote liability greater force than to that positively and directly assumed. We regard the stockholders as the constituent parts of the corporation; we consider them as assuming, by their subscription, direct obligations to each other, and to the artificial being resulting from their association. The obligations assumed are mutual. Each is induced to subscribe in consideration of the subscription of his associates. They contract towards each other reciprocal duties, which cannot be released without the consent of all. Each is the debtor to the mass to the amount of his stock, and each has an interest that all the others shall fulfill their obligations, and consequently each is the creditor of the others. Hence, for their respective rights and interests, the stockholders are within the exception admitted by the counsel of the plaintiffs. The power of the direction to call for payment, does not depend on the purpose to which the money is to be applied. They are to call at their discretion. Whether to pay debts, to construct railroads, to loan at interest, or for liquidation—the share-holders must obey. If justice to the creditors of the corporation demands full payment in one case, justice to the associates requires it in the other. If the call were made by the direction, the courts would enforce obedience at the suit of the corporation. If the demand were made by creditors, the courts would enforce satisfaction directly from the stockholders, or indirectly, by forcing the direction to make the call. How then can it be contended, that the courts have not the same power to enforce payment on the demand of a paying stockholder; who by the complete performance of his own contract has acquired the right to demand the like compliance from his associates, whenever an injury would result from their default. It is but the common right of any party interested in a contract, to compel its observance by the other parties. The form is unimportant. The charter provides, that it shall be done by a call of the direction; but if not done in that manner, it is within the power and becomes the duty of the courts, to enforce the execution of the contract, in some other form. Now, it is demonstrable, that the action of the directors, of which the plaintiffs complain, is equivalent to a call of instalments, in order to effect a fair division of assets. So *Millaudon* understood, when he was pressing the direction for years, either to call in the balance of the stock, or to refund him his excess of payment, which would amount to the same thing. If the whole capital be not demanded for banking or railroads, it would be competent, as a step preparatory to a final division, to call in all the stock; thus replacing the shares on an equal footing. But to pay a stockholder $55 at the same moment you require him to pay $50, is equivalent to a dividend of $5. It is, in fact, a fictitious call of instalments, at the moment of declaring a dividend. If so, the form must be disregarded, and the action of the board sustained. Let us apply these principles of equality to the present case. Suppose the direction were to demand of the half paid shares an instalment of $10, and at the same time make a division to all the stockholders of $15 a share. The court could not possibly interfere with their resolution. The condition demanded by the counsel would have been fulfilled. The instalment would be due by a call of the direction, and yet the position of the half paid stockholders would be precisely what it is under the resolution now attacked. In either case, they would receive $5 a share. It would seem then, that this formidable objection is one merely of form, and not of substance.

Another argument of the plaintiff's counsel deserves notice from its plausibility, to wit: that the dividends or profits are awarded to the full paid stockholders in proportion to their payment, and consequently the losses should be borne in like proportion. This was the point on which the learned judge of the lower court decided this case in favor of the plaintiffs. He considered it governed by the provisions of the act of 1835, which declared that the dividends shall be in proportion to the amount paid in, and the very resolution under which the full payment was received, contains the same provision. These provisions necessarily contemplated the continuance of the business of the corporation, and the dividends declared from its profits. They were declared *pro rata* upon the capital paid in, because the profits were the fruit of that capital, and not of the barren promises of those who did not pay. But when the business of the company was closed, and nothing remained for division among the stockholders but the remnant of the capital, the rule prescribed for the

division of profits, was not applicable to the altered circumstances. Each party was then to withdraw his investment, and not his profits. Those who had paid in full, should not suffer from the default or neglect of those who had paid but half; equality must be restored, and then the division would proceed upon fair and equitable principles. But it is said, that if the business had been prosperous the full paid shares would have enjoyed the benefit. The argument forgets that the half paid stock was entitled to precisely the same benefit. The door remained open to its owners. They could participate in dividends, on precisely the same terms with those who paid before them; that is by paying up their stock in full. Now, if the profits had been as great as the losses actually incurred, the half paid stockholders would have been eager to pay in full, in order to participate in these profits. If in that event their full payment had been refused, the plaintiffs would have been clamorously asserting the propositions which they now treat with ridicule. They would point to their subscriptions, to show that they had been always bound to the full amount; and would have pleaded, that they had never been technically in default, because the direction had never peremptorily called for payment. Yet in that case the experiment by which the institution was launched into a successful and prosperous business would have been made upon the capital of those who first paid, while those in arrears were watching its success with their money in their pockets.

The counsel argue as if a great favor was done to a part of the share-holders by permitting them to pay in full; a favor so great as to extingish the obligation of the plaintiffs to pay the balance of their own subscriptions. They forget that the option was offered to themselves, and their choice shows that they consider the privilege of retaining, a greater favor than that of paying. To the same category belongs the consideration, that the full paid stockholders were entitled to larger loans than the half paid. It was the proper result of the difference of position. If they borrowed more money they paid more interest. The very interest paid by themselves, increased the fund from which dividends were drawn. Hence the correct application of the favorite maxim of the plaintiffs, "*qui sentit commodum, sentire debet et onus*", brings them no comfort or relief. It would seem, therefore, that the full payment of some of the shares, only temporarily disturbed the equality contracted by the charter. This equality it is the right and duty of the direction to restore, whenever justice to those who have paid requires it. It was equally in the power of those who withheld their money to restore the equilibrium by paying. To maintain the contrary, and throw a greater portion of the losses on the paying stockholders, is equivalent to releasing from an express obligation those who preferred not to pay. It gives a premium to delinquency, and punishes the promptitude of those who paid before demand. We have taken no notice of the act of 1839, fixing the capital of the banks at the amount actually paid in. If that act attempted to affect or impair in any manner the rights and obligations contracted by the subscription to the stock, which formed the compact, the bond of association between the partners, it must be unconstitutional. As the action of the board is, in substance, a call of an instalment, simultaneously with the declaration of a dividend, so the effort of the plaintiffs to annul that action is, in substance, an attempt to throw off the liability to pay $50 a share, to which they bound themselves by their subscription. We must, therefore, maintain that the equality of shares was one of the fundamental stipulations, contracted by the subscription, under the charter; that it was a contract between the stockholders, as well as a contract between them and the corporation; and that neither the direction, nor the courts, nor the law, can impair the obligation of that contract, in any of its parts, by rendering unequal what the contract declares to be equal.

The principles for which we contend, are of constant and familiar application, in all cases of common rights and common interests. If two partners bind themselves, each to invest $100 in a common enterprise, and one of them pays in full, and the other pays nothing, the latter is the debtor of the firm to the amount of his promised investment. The business of the firm is conducted upon the credit of the whole capital, as promised. If it were agreed that each partner should receive an interest on the surplus of his advances, in addition to his share of the profits, that agreement would not release the other party from paying. If such a firm were to liquidate, the first step would be, to charge the non-paying partner with the amount which he promised to invest. That debt would be one of the assets of the firm. The profits would then be ascertained,

PURTON
*v.*
NEW ORLEANS
AND CARROLL-
TON RAILROAD
COMPANY.

Purton
v.
New Orleans
and Carroll-
ton Railroad
Company.

*pro rata*, upon the entire capital, and the capital and assets would be equally divided. If this form were not pursued, equality would be restored by first returning to the paying partner the excess of his investment, and then dividing the balance equally. So in a joint acquisition of property, in equal shares, where one partner actually pays three-fourths of the price, and the other one-fourth, the paying partner does not become the owner of three-fourths of the property, but a creditor for the money advanced on the share of his co-proprietor. The whole theory of partition, so carefully developed in our Code, rests on precisely the same priciples. Equality is first restored by collation, from the co-proprietors or co-heirs, and then the division is made. The debt or advancement made to the heir is first added to the mass, fictitiously or really, and then the shares are respectively and equally apportioned. To make the matter more plain, we propose a single illustration by figures. Suppose only two partners, each of them bound to contribute $100 to the capital stock, of whom one has actually paid the $100, and the other only $50, and remains debtor for $50. Now suppose a loss of $130, equal to 65 per cent on the whole capital, and then a dissolution and division. There would remain on hand only $20. If the whole of that were paid to A, who contributed $100, he would be a loser to the amount of $80, and B, his equal partner, would have lost but $50; then B must collate, and a settlement could only be made as follows: Capital agreed $200: actually paid in $150: B, to collate his debt of $50. Loss on the whole $130; balance for equal division $70. B would pay $50, and receive $35, or which is the same thing, would pay $15. The same result is produced, by first deducting the excess of A's payment: A loses, for his share, 65 per cent, or $65: he is to receive $35: the fund is $20: B must pay to A $15. Suppose a gain of 65 per cent: the capital actually invested is $150: B is debtor for part of the capital $50: the profits on $200 are $130; remain for division $330. A receives one half, $165: B cancels his debt of $50 and receives $115, thus making an equal division of $330.

It is a principle in equity, that whatever ought to be done by a party seeking relief, must be done by him before relief can be granted. If the case admits of it, whatever ought to be done will be considered as done, for the purposes of the suit. If we have succeeded in demonstrating that the position of the plaintiffs is precisely the same as if the board had demanded of them an instalment of $10, and at the same time declared a dividend of $15; and, if that proceeding would be consistent with justice and equity, the court must treat the case precisely as if that course had been literally followed.

With regard to the intermediate class of stockholders, those who paid $100 a share, and have received in property $50, it remains to make a few observations. If the position assumed by the Supreme Court in *Millaudon's* case, on which the first branch of our argument turns, be correct, those who paid in full, must, for the purpose of liquidation, be esteemed stockholders for $50, and creditors for $50 a share. Now the corporation is solvent, though a large portion of its capital has been lost. Hence the claim of $50 per share, as a debt, is worth par, while the half stock is depreciated greatly in value, and in the market. Under these circumstances, if property of the company had been offered in exchange for stock at the amount paid in, it would have been equivalent to a division on the principle assumed by the plaintiffs. So far as the voluntary payment of $50 was concerned, the stockholders were in effect creditors, and the corporation being solvent their claims were equal to par. If the half paid stock were received in the bidding as equivalent to these credits, the competition would have been utterly unequal. The paying stockholders would bid in specie, the half paid stockholders in stock, and in the bidding, the stock, of only half its nominal value, would be received as equivalent to the specie portion of the full paid shares. To avoid this unequal and unjust result, the board considered all as stockholders at $50 a share, representing the payments made under the call of the direction, and received the bidding upon the shares as of $50 each; leaving to the full paid stockholders their legal claims upon the corporation and the corporators, for the reimbursement of their excess of payments.

We have already shown that the result is the same, whether this debt is paid by returning the excess from the assets, or by first calling in new instalments, and then dividing equally. It follows, that the property purchased by the full paid shares, stands the equivalent of the first half of their stock paid in; the

dividend made to them on the other half, is a payment on account of the debt due to them.

The classification of the stockholders by the direction, and the dividends declared, are thus supported and explained: The 1st class of $50 shares, receive $5; the 2d class of $100 shares, receive on the first payment $5, and on the last payment, $10=15. The 3d class, originally $100, receive nothing on the first payment, and on the last payment, $10. The first half of their stock was extinguished by their purchases, and the amount awarded them, reduces their claims as creditors.

*Denis*, and *R. N.*, and *A. N. Ogden*, in reply. Plaintiffs' counsel state the true question to be, whether the shares are, for the purpose of liquidation, equal or unequal; and admit, that if unequal, our view of the division of the assetts is correct. Let us look at the facts, and we shall see, that in point of fact at least, they are unequal; that this inequality is contemplated by the charter, and its effects regulated; that it has been produced by the voluntary acts of the defendants, and the classes of stockholders they represent; and that it has been acquiesced in by all the stockholders. The company was chartered in 1833, with a capital of $300,000, divided into shares of $100 each, on each of which $5 was to be paid on subscription, "and the residue thereof in such instalments, and at such times, as may be required by the president and directors of said company." In 1835, the capital stock was extended to $3,000,000, divided also into shares of $100 each, on each of which $5 was to be paid on subscribing, and the "residue thereof in such instalments, upon such notice, under such penalties, and such provisions, as are set forth with regard to subscriptions to the original stock of said company, in the second section of the original act of incorporation thereof." See acts of 1835, sec. 1, p. 81. The 18th section of this act, contains this provision: "All future dividends of said company shall be participated in by all its stockholders, in proportion to the amounts by them respectively paid in; but no dividend shall be made or received, in favor of any instalments, which shall not have been paid in more than three months, prior to the declaration of such dividend." How this was understood by the company, is shown by a resolution of the board of directors of the 13th of May, 1846, in these words; "*Resolved*, That any stockholder who shall pay, in anticipation, a part, or the full amount due on the capital held by him, shall be entitled thereon to dividends in proportion to the amount respectively paid in: provided, that no dividend shall be made or received in favor of any instalment which shall not have been paid in more than three months prior to to the declaration of such dividend."

Under the 18th section of the act of 1835, amending the charter, and under this resolution, passed in pursuance of it, and carrying it into effect, it is clear there might have been a half a dozen classes of stockholders, with unequal shares, and receiving unequal dividends. It is admitted, that the board never did call for more than $50 on each share. The causes that led to this resolution have been shown to the court. This resolution was procured by the influence of the larger stockholders, and with a view to their own interests, and under it they completed the payment of their original subscriptions. By this voluntary act, they were benefited: first, in being able to sell their stock in the European markets, where it was at an advance; second, in receiving loans of $40 on each share, while the half paid stockholders could receive but $15 per share; third, in being permitted to pay up their subscriptions, as it is proved they did, by means of stock loans; and fourth, by receiving larger dividends than the others, in exact proportion to the difference in their shares; and to this may be added, the extraordinary advantage, marking still more strongly the inequality of the shares, that they received dividends for six months, when they had paid up in antcipation, only three months before the time of the semiannual declaration of dividends. Thus an actual inequality was established by these stockholders, for their own benefit; and when the stockholders authorised, subsequently, the sale of the assets, and the right to purchase, by payment in stock, they recognized this inequality—they again recognized it and ratified what had been done by the board, when they sanctioned the proposed division of the assets, which we are now combatting.

But the counsel contend, that this inequality could not be created by the resolution, and the payments under it, unless by releasing, absolutely, the half-paid stockholders from a part of the liability incurred by their subscription, and that the direction was not competent to do this, and indeed did not undertake to do it. This is entirely erroneous. We may readily admit, that such

4

PURTON
v.
NEW ORLEANS
AND CARROLL-
TON RAILROAD
COMPANY.

was not the aim, nor the effect of the resolution; and that the board had no such power. But it is an error to say, that an actual inequality may not be established among the stockholders themselves, by their mandataries, and with their consent, without carrying with it a release of liabilities towards creditors. The stockholders might be required in two ways, and only in two ways, to pay up the amount of their subscription. One by the action of the board of directors, in the precise form provided in the charter. The other, by the action of the creditors, through the courts, compelling payments to meet debts. So far as the obligation to the stockholders or to the company is concerned, it is clear the payment can only be coerced in the mode agreed upon in the charter. As to creditors, it will be time enough to consider that, when creditors present themselves. In this case, it admitted that the company is perfectly solvent. A paper annexed to the exception filed by defendants in this case represents that there is a large surplus fund now on hand, and a still larger one expected, for division and distribution among the stockholders; and the only question which can arise, is as to the just and equitable distribution of this surplus. The very case of *Millaudon*, on which the counsel so much rely, admits that the direction has now no power to call for additional instalments, unless in case of deficiency, and to pay debts. It may also be well worthy of notice, that the act of 1839, which revived the forfeited charter, and could of course annex to the reviver such a condition, limited the amount of the capital to what should be actually paid in on the 1st of February, 1841 ( p. 68.) This, of course, would not have the effect of releasing any half-paid stockholder from his liability to a creditor of the bank. But as regards the stockholders themselves, who accepted it, it certainly fixed the amount of capital, and took away from the board the right to call for any further instalments, unless to pay creditors. Whatever, then, may be the theoretical equality of the shares, there has been, as we have shown, a practical inequality established, which the board was competent to establish, so far as the stockholders or partners were concerned— which they have voluntarily acted on, and under which the profits have been divided.

The counsel next contend, that the parties they represent, are creditors, and that the "action of the board," of which we complain, "is equivalent to a call of instalments, in order to effect a fair division of assets." That "it is in fact a fictitious call of instalments, at the moment of declaring a dividend." This is entirely fallacious. First, as to this "fictitious call of instalments."—It has been shown to the court, that the charter, which is "the peculiar law to the company," points out the precise form in which this call is to be made, and affixes the penalty of non-compliance. We need not say that this artificial being, the corporation, must observe the fundamental rules prescribed to it by the law to which it owes its existence. Suppose a call made in any other mode than the one required by the charter, would the penalties contained in the charter attach? would the stock and all previous payments be forfeited? Would the stockholder even cease to have a right to vote, and, if a director, to retain his seat at the board? In this instance, would there be, as the charter directs, "a new subscription opened to make up such deficient shares"? In the argument of the case of *Millaudon*. the counsel who represented him stated to the court, "that the bank, it is admitted, has gone into liquidation, and no other call for capital will hereafter be made on its stockholders." He also contended, that the act of 1839 had limited the capital to the amount paid in on the 1st of February, 1841. This is mentioned with a view to introducing the remarks of the court on this point. They say: "In liquidating the concerns of the bank, the board of directors become the mandataries of the stockholders for that purpose, and the trustees of the creditors of the bank. Their duties result from this two-fold relation towards the stockholders and the public. They can declare no more dividends, nor subject the stockholders to any new liabilities. They are so to husband the resources of the bank as to meet all its existing liabilities, and preserve for the stockholders as much of the capital as possible. If, for the purpose of paying debts, a farther call upon the stockholders who have not paid their subscriptions in full should be necessary, we do not doubt the authority and obligation of the directors to make the call." And, in speaking of the act of 1839, their meaning evidently is, that so far as creditors are concerned, the stockholders remain bound by their original subscription, and must contribute to make up any loss or deficiency to the public; but for banking purposes, the capital was limited by the act of 1839. This favorite authority

of the counsel is quoted, as an answer to them, when they say, "the power of
the direction "to call for payment, does not depend on the purpose to which
the money is to be applied. They are to call at their discretion, whether to
pay debts, to construct rail-roads, to loan at interest, or for liquidation." In this
they are clearly mistaken. At present, the direction could make no call except
to pay debts; the very resolution declaring the dividend which we are now
opposing, proposes a division among the stockholders of a surplus fund. So
that this "fictitious call" is nothing but an ingenious fiction. It can afford no
aid in solving the question in this case, which relates simply to the just and
equitable mode of dividing the funds on hand among the partners. But, say
the counsel; these stockholders are creditors; the stockholders "assume,
by their subscription, direct obligations towards each other." "Each is
induced to subscribe, in consideration of the subscription of his associates."
Now, was that what induced the larger shareholders to pay up their subscrip-
tions in full? No. They knew the others had refused to do it. They had
been unable to get the board to call in the whole of the stock. It was not con-
sidered by the board a measure advantageous to the company. It was, therfore,
done by them for their own purposes, on their own views of interest, and with-
out the slightest expectation that it would be done by others. And what did
they subscribe originally?—a charter, which left the call for payments, entirely
to the will and discretion of the board of directors. When a call was made,
they had a right to expect all to to comply—and all did comply. But when no
call is made, what obligation is violated? When they procure for their own
purposes the passage of a resolution, holding out to them important and valuable
advantages for completing the payment of their subscription, and in view of
those advantages voluntarily do so, can it be seriously contended that this gives
them a right to compel the others to do the same thing? Yet such is the argu-
ment which makes them creditors. But again, no man can make another his
debtor, unless by rendering him some service, or conferring some advantage on
him. Now if the increased fund of the bank arising from the voluntary pay-
ments, had been employed for the common benefit of all the stockholders, each
receiving an equal share of the profits, it would undoubtedly have been a loan
and the stockholder so advancing, a creditor. But when the reverse is the
fact, when every cent of interest or profit accruing on this advance is enjoyed
by the partner making the advance, when he puts in the additional sum under
no compulsion, but with a view to derive advantage to himself alone, and when
in doing this he confers no earthly advantage upon the other stockholders or
the company, how can he possibly be considered a creditor? It is a monstrous
perversion of language to call his advance a loan. It is an investment, and he
remains a partner, with a right, on final settlement and division, to a larger pro-
portion of the assets corresponding with his larger interest in the co-partner-
ship. It is perfectly clear that the same stockholder could not be, for the
same advance both creditor and partner at the same time, because the two
characters are inconsistent. As creditor he is entitled by the charter to five
per cent interest. As partner he takes his share of the dividends and of the
stock loans, in proportion to the amount of his investment. This is what they
have done; they have chosen the situation of partners, and cannot now claim to
be creditors. Suppose the funds of the bank had been profitably employed
and that regular dividends were declared every six months, in which these
stockholders took twice as much as the plaintiffs, could they do so on any other
ground than that of being partners? And if after the lapse of years, in the
prosecution of this same business, unexpected reverses should occur, would
they be permitted to say, we are creditors. Refund to us our advance with
interest, and then divide the surplus. Yet this is what the defendants contend
for—the flagrant injustice of the proposed distribution is most strikingly shown
in the case of the intermediate class, who have already received a payment of
fifty per cent on their advance. It will be recollected that the counsel of defend-
ants, say that they were permitted (and such is the fact as in proof,) to buy
property, paying for it to the amount of $50 on each share by their stock at par,
although the stock was not then worth in the market more than one half of its
nominal value. By this means they say their original subscription was repaid,
and their stock extinguished, and that they therefore received no dividend
proper, but only received $10 per share as a payment on account of the debt
due to them for the last $50 payments. Yet it is but a short time since these
gentlemen, who are now creditors, were partners and stockholders, receiving

PURTON<br>
v.<br>
NEW ORLEANS<br>
AND CARROLL-<br>
TON RAILROAD<br>
COMPANY.

PURTON
*v.*
NEW ORLEANS
AND CARROLL-
TON RAILROAD
COMPANY.

large dividends on this very $50 for which they now pretend to be creditors. And it is shown by their counsel that they have enjoyed the extraordinary advantage of using their stock as specie, when it was worth only half of it, in buying valuable real estate; that in other words, after enjoying for years all the advantages of stockholders in dividends and bonds, they were repaid dollar for dollar, one half of their subscription, and now modestly claim the right to consider themselves creditors for the other half, and claim to be paid doubly as much as our clients, who have as yet received nothing in re-payment of their subscriptions.

The judgment of the court was pronounced by

ROST, J.[*] This case involves a contest between the different classes of stockholders of the *New Orleans and Carrollton Railroad Company*, as to the proportion in which the capital stock should be refunded to them.

The *New Orleans and Carrollton Railroad Company* was chartered in 1833, with a capital of $300,000, divided into shares of $100, on each of which $5 were to be paid on subscription, and the residue in such instalments and at such times as might be required by the president and directors of said company, provided that at least ten day's notice of such requisition should be given in two newspapers; and if any subscriber failed or neglected to pay the instalment thus required to be paid, for the period of ten days next after the same should be due and payable, the stock and previous payments were to be forfeited to the company. This stock appears to have been entirely paid up.

In 1835, the company was authorised to do banking operations. Its capital stock was increased to $3,000,000, divided into shares of $100, on each of which $5 were to be paid on subscribing, and the residue thereof in such instalments, upon such notice, under such penalties and such provisions as are set forth with regard to the original stock in the act of incorporation of 1833. The 18th section of the act of 1835, contains this provision: "All future dividends of said company shall be participated in by all its stockholders in proportion to the amounts by them respectively paid in; but no dividend shall be made or received in favor of any instalments which shall not have been paid in more than three months prior to the declaration of such dividend."

On this last subscription the directors did not call in more than $50 per share; but on the 13th May, 1836, they passed a resolution in these words:

"*Resolved*, that any stockholder who shall pay in anticipation a part, or the full amount due on the capital held by him, shall be entitled thereon to dividends in proportion to the amount respectively paid in; provided that no dividend shall be made or received in favor of any instalment which shall not have been paid in more than three months prior to the declaration of such dividends."

This resolution was passed on the application of the large shareholders, who wished to throw their stock in the European market, where it is proved it could not have been sold if not paid in full. They availed themselves of its provisions by paying up, received dividends upon the whole amount when dividends were made, and while the other shareholders were only entitled to borrow on pledge of stock $15 on each half paid share, they had the privilege of borrowing $40 per share, thus paying their shares in full by an actual disbursement of $10 for each. The bank suspended payment in 1837, and in 1839 the legislature passed an act relieving this and other banking institutions from the forfeiture incurred by the suspension, on certain conditions, one of which was that the amount of their capital would be limited to what should be actually paid in on the 1st of February, 1841. This act was accepted by the defendants, and

---

[*] SLIDELL, J., being interested, did not sit in this case.

became a part of their charter. The defendants have since gone into a liqui- <span style="float:right">PURTON<br>*v.*<br>NEW ORLEANS<br>AND CARROLL-<br>TON RAILROAD<br>COMPANY.</span> dation of the affairs of the bank, retaining their corporate powers for carrying on the railroad only; and, after paying all their liabilities, there remained in their possession a large amount of real estate not necessary to their operations, which, under a resolution of their board, was sold in 1844, payable in the capital stock of the company on which $50 had been paid, and with the privilege to those who had paid in full to give in payment $50 on each share, without prejudice to them or the company in regard to any rights which they might have as creditors for the remaining $50 per share. Many of both classes of stockholders purchased under this resolution, and the stock given by them in payment appears to have been sunk by the board.

A large amount of money having since been collected, and the company having no profitable use for it, the board came to the conclusion to refund to the share-holders a part of the capital paid in, and declared a dividend distributing the fund on hand, as follows: $5 per share on the half paid stock; $15 per share on the full paid stock; $10 per share to the shareholders who had originally paid in full, but who purchased since property from the company to the amount of $50 per share.

Upon the declaration of this dividend, the plaintiffs, who are holders of half paid stock, brought this suit and obtained an injunction on the following grounds: 1st. That the fund ought in justice and equity to be divided among the stock-holders according to their respective interests in the corporation, each to receive in the proportion in which he has paid, after accounting however for what he may already have received, and receiving nothing until those who have as yet received nothing shall have been placed on an equality with them. 2d. That the third class of stockholders, according to the classification made by the board, to whom $10 a share are allowed, have now no greater interest in the corporation than the petitioners, and, having already received $50 per share in real estate, are not entitled to receive any thing more until the other shareholders have received $50 on the capital respectively paid in by them. 3d. That among the stockholders of the second class many are indebted to the corporation for loans on pledges of stock, and that the dividend accruing to those stockholders should be applied to the extinguishment by compensation of their stock debt *pro tanto*, and not paid over to them as proposed by the board.

The answer is a general denial, and an averment that the distribution com-plained of was regularly ordered by the board of directors and by a majority of the stockholders, at a regular meeting, and that it conforms in all respects to the charter of the bank and the just rights of the parties interested. There was judgment in favor of the plaintiffs, that the defendants be perpetually enjoined from paying to the stockholders the dividend declared by them, and from making any dividend which shall not be in exact proportion to the amount of capital paid in, and remaining to the credit of each stockholder. From this judgment the defendants have appealed, and the appellees allege error to their prejudice in this: 1st. That the judgment recognises the right of the holders of stock paid in full, who purchased property of the company to the amount of one-half of their stock, to participate in the assets now to be divided. 2d. That it does not decree that the amount coming to the stockholders indebted to the bank shall go, *pro tanto*, to the extinguishment of their stock debt. The appel-lants ask the reversal of the judgment on the ground that, for the purposes of liquidation, the stock must all be treated as composed of shares of $100, as fixed by the charter; and that the shareholders who have paid the whole

PURTON
v.
NEW ORLEANS
AND CARROLL-
TON RAILROAD
COMPANY.

amount are creditors of the corporation for $50 per share, and entitled to be reimbursed that amount before a dividend is made. They further allege that the stock given in payment of real estate was thereby extinguished, and that on other grounds it cannot be taken into consideration at the present time.

Most of the questions involved in this controversy came before the late Supreme Court, in the case of *Millaudon* against the same defendants, 3 Rob. 488, and the court there assumed as undoubtedly true that each share of $100 was to bear an equal loss on the final liquidation of the bank, without regard to the amount actually paid in by the various classes of stockholders. The court came to this conclusion by viewing the association of the shareholders, *inter se*, as a partnership in all respects according to the custom of merchants.

We differ from this view of the law of the case, and we hold that incorporated, trading companies are not partnerships according to the legal principles applicable to partnerships formed by the voluntary agreement of individuals, and that the association of the shareholders does not constitute a partnership according to the custom of merchants, nor within the principles of law established respecting joint-traders. Corporations are to be treated with reference to the objects of their creation, and to the express powers with which the legislature may have invested them; to that extent the general law of partnership is superseded by the charter. Gow on Partn. p. 3. Wordsworth, Joint Stock Comp. 29. Law Library, p. 152.

The correctness of the opinion of the court in *Millaudon's* case, therefore, must be tested with reference to the distinctions which bank charters establish between shareholders and ordinary commercial partners. One of the most material differences is that, shareholders are not liable on account of the joint trade in their individual capacities, nor one of them for the debts and engagements contracted by others, but only for their respective shares or interest in the joint stock, and that upon the trade and contracts carried on or made in the corporate character. Another material difference is that the shareholders have at all times the right to transfer their shares; to introduce by so doing new partners in the association, and to withdraw themselves from it. This limitation of responsibility, and this power to transfer stock, do not exist in ordinary partnerships, and create this marked distinction that, while persons trading with an ordinary partnership are uninformed as to the amount of its capital and deal upon the personal credit of the partners, persons dealing with a corporation are uninformed as to the partners, and deal upon the knowledge of the capital and of the mode in which it is to be administered, as acquired by the promulgation of the act of incorporation. When this company began banking operations, they represented themselves to the public as trading upon a capital of $3,000,000, divided in shares of $100 each, to be paid up as required by the business of the bank. It is the fact of so representing themselves which renders the stockholders liable to third persons for the full amount of their subscription, whether called in or not. The argument pressed upon us at bar that, if the obligation to pay the stock in full was not absolute between the shareholders, it could not be absolute as to creditors, misapprehends the nature of the obligation towards creditors, and has no bearing on the question whether the shares are equal or unequal.

Another material difference between ordinary partnerships and corporations is to be found in the power conferred upon the officers of the latter to make by-laws; and it is a remarkable fact that the claim of the plaintiffs to be considered as creditors of the corporation under the custom of merchants, origi-

nated in one of those by-laws which that custom no where recognises among commercial partners. The extent of the power given to corporations in authorising them to make by-laws is not accurately defined; but the effect of the power, when properly exercised, is that the shareholders are bound by a set of provisions and rules beyond those actually contained in the charter, and, as far as they extend, they also supersede the general law of partnership. Wordsworth, Joint Stock Companies, 29. Law Library. no. 256, p. 152. Civil Code, arts. 424, 436.

It is contended by the appellants, and it was held in *Millaudon's* case, that between the shareholders as well as towards third persons, each was n debtor to the association for what he had promised to bring in, that is for the whole amount of his subscription. However this may be in ordinary partnerships under the custom of merchants, the charter of the defendants does not authorise that conclusion. It did not originally fix any definite period within which the whole capital was to be paid in, and we are satisfied that that period cannot be implied from the condition subsequently imposed on the company, to furnish within a given time the whole capital allowed to the branches of the bank. The stock was to be paid at such time and in such proportions as might be required by the president and directors, and the charter did not oblige them to call in the whole of it. Each call was to be made by a by-law; but the time of passing those by-laws, and whether they should be passed at all, was left uncertain, and exclusively depended upon the will of a majority of the board. To guard under all contingencies the interest of the holders of the stock subscribed under the act of 1833, which had been called in, the charter provided that the dividends made by the company should be participated in by the stockholders, in proportion to the amounts by them respectively paid in. This clearly recognises the inequality of shares between the stockholders; and the act of 1839, limiting the capital of the company to the amount actually paid in on the 1st February, 1841, without requiring the payment of the subscription in full, again shows the construction which the legislature put upon the charter. The shareholders, by consenting to make that act a part of the charter, must be considered as having also adopted that construction, and their rights must be tested by it.

The time given by the charter for the payment of the subscription was not *the term* of the obligation, as is the case when ordinary partnerships are formed. The passage of the by-laws making the calls was an uncertain event, and formed a condition which, between the shareholders, suspended the obligation to pay till it was accomplished. Under the general principles of the civil law, as well as by the express provisions of our Code, the *dies certus* is the term, and the *dies incertus* is generally the condition, of the obligation. Civil Code, 2044. Mackeldey, Manuel de Droit Romain, p. —. Conceding that the *dies incertus* does not in all cases create a condition, and that whether the parties intended to create a condition or only to modify the obligation without making its existence depend upon the event, should be determined, if the case admitted of a reasonable doubt, by applying the rules established for the interpretation of obligations, the construction put upon the charter by the stockholders, as evidenced by their receiving dividends of profits instead of interest, and by their acceptance of the act of 1839, furnishes the safest rule of interpretation.

We consider that, between the shareholders, the obligation to pay the balance for their subscription was suspended until the calls were made in the manner prescribed by the charter.

PURTON             The stockholders who paid in full, under a by-law, made at their own request,
NEW ORLEANS  which authorises them to do so, now insist that they made a loan to the com-
AND CARROLL-  pany of $50 per share.  If so, it is incumbent upon them to show that a
TON RAILROAD
COMPANY.       contract of loan was intended and executed.  A loan of money may be gratui-
tous, and when it is not the consideration of it is interest.  In this case a
participation in the profits of the company, and not interest, was the con-
sideration stipulated ; it was essentially a contract of partnership.  C. C. 2772.
Under that contract the stockholders who paid in full were in fact to receive
the whole profits made upon the additional sum paid, and they now claim to be
exempted from contributing to losses on that sum.  Had such a stipulation
been expressly entered into it would be void, both as it regards the partners and
third persons.  C. C. 2785.

The shareholders who, for their private emolument, paid up the whole
amount of their stock, became partners of the company for the amount so paid
in.    The inequality of the shares was contemplated, authorised and provided
for by the charter ; and that inequality exists for the purposes of liquidation as
well as for the division of profits.

There being no errors in the judgment of which the appellants can complain,
those assigned by the appellees remain to be considered.   We concur with the
judge of the first instance, that the first ground of error assigned cannot be
noticed in the present controversy.   It is true that, under the law of ordinary
partnership, partners who hold property of the firm are bound to collate at the
time of the final partition of the partnership assets.   But this is not a final
partition.   The company is still in existence ; and if, at its final dissolution, any
of the stockholders should be bound to collate, they will have it in their power
to make the collation in kind by returning the property.   The omission of the
court below in not decreeing that the dividends of shareholders indebted to the
bank for stock loans shall go *pro tanto* to the extinguishment of their debt,
instead of being paid over to them, must have been an oversight under the view
taken by the court of the rights of shareholders.   These loans are in fact
debts due by the stock, and, as far as the dividends go, they should have been
compensated with them ; in that respect the judgment must be amended.

We have not noticed the exception as to the want of proper parties, because
we consider it to have been properly overruled in the first instance.

It is therefore ordered that the judgment in this case be amended, so as to
compensate any future dividends coming to stockholders indebted to the defend-
ants on stock loans, with an equal amount of that indebtedness.   It is further
ordered, that the judgment as amended be affirmed, with costs.